Derrick M. Davis, Esq., TN BPR No. 037122 (*pro hac vice forthcoming*)
Derrick@trademarkia.com

Pablo Enrique Segarra, Esq., New York SBN 5707039
Pablo@trademarkia.com

LEGALFORCE RAPC WORLDWIDE, P.C.
446 E. Southern Ave
Tempe, AZ 85282
Telephone:     (650) 390-6402
Facsimile:      (650) 989-2131

*Attorneys for Plaintiff,*
Qrypt Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QRYPT INC., | |
| Plaintiff, | Case No.: 1:25-cv-5275 |
| v. | **COMPLAINT** |
| QRYPTONIC LLC, | |
| Defendant. | |

Plaintiff Qrypt Inc. ("Qrypt" or "Plaintiff"), by and through its attorneys, LegalForce RAPC Worldwide, P.C., for its Complaint against defendant Qryptonic LLC ("Defendant"), alleges, on knowledge as to its own actions, and otherwise upon information and belief as follows:

## NATURE OF THE CASE

1.      This is an action for infringement of Plaintiff's federally-registered trademark QRYPT ("Plaintiff's Mark" or the "QRYPT Mark") under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), for unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), for cybersquatting under Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), and for substantial and related claims of trademark infringement, dilution, and unfair competition, as well as deceptive trade practices under the statutory and common laws of the State of New York, all arising from the Defendant's unauthorized use of the mark QRYPTONIC (the "Infringing Mark") in connection with the marketing, advertising, promotion, offering for sale, and/or sale of Defendant's cybersecurity services and related offerings as described herein (collectively, "Defendant's Services").

## JURISDICTION AND VENUE

2.      Several of Plaintiff's claims arise under the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.* Pursuant to the provisions of 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, this Court has subject matter jurisdiction over the claims in this action which relate to federal questions surrounding Defendant's trademark infringement and unfair competition.

3.      This Court also has supplemental jurisdiction over the claims in this Complaint which arise under the statutes and common laws of New York pursuant to 28 U.S.C. § 1367(a), as the state law claims are so closely related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

4.      Personal jurisdiction over Defendant is proper pursuant to N.Y. C.P.L.R. §

302(a). This court has specific personal jurisdiction over Defendant because Plaintiff's claims

both arise out of and relate to Defendant's contacts with this state. Upon information and

belief, Defendant purports to regularly transact and/or solicit business in this state and

commits its tortious acts within this state. Specifically, upon information and belief,

Defendant's Services theoretically provided under the Infringing Mark are marketed,

advertised, promoted, offered for sale, and/or sold in this state, taking as true Defendant's own

representation on its website that it maintains an office in New York from which it transacts its

business. *See* Exhibit A, which is a true and correct screenshot of the landing page for

www.qryptonic.com, hereafter, "Defendant's Website" or the "Domain Name." By having an

office in New York from which it promotes its services under the Infringing Mark, Defendant

has purposefully availed itself to the benefits of this forum, and could reasonably foresee that

it would be subject to litigation here.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a

substantial part of the events or omissions giving rise to the claim occurred in this district.

## **PARTIES**

6.      Plaintiff is a Delaware corporation having a principal place of business at 1

World Trade Center, Suite 83a, New York, New York 10007.

7.      Upon information and belief, Defendant is a Florida limited liability company

having its principal place of business at 1000 Biscayne Blvd., Miami, Florida 33131.

## FACTS

**I.    Plaintiff and its Rights in the QRYPT Brand.**

8.    The question of whether the scientific fields of quantum encryption and cybersecurity are immensely technical, specialized, and sensitive in nature is not up for debate.

9.    Due to the complexity of the subject matter, credible individuals in the realm of quantum encryption invariably possess impressive academic and professional accolades. To work in the realm of quantum encryption, one must have a strong working knowledge of computer science, physics, and mathematics at a bare minimum; beyond the realm of academia, commercial viability for such knowledge is even more niche, as those who seek to utilize such expertise are often governmental agencies and multinational corporations.

10.    For example, Plaintiff's CEO (Kevin Chalker or "Mr. Chalker") and CTO (Denis Mandich or "Mr. Mandich") hold degrees in international public policy and physics, with decades worth of experience in the U.S. intelligence community, where they worked on projects related to national security, cyberinfrastructure, and advanced technology development. Mr. Chalker and Mr. Mandich are founding members of QED-C, which is an organization that was established with support from the National Institute of Standards and Technology (NIST) as part of the federal strategy for advancing quantum information science as called for by the National Quantum Initiative Act of 2018. Plaintiff's Chief Cryptographer (Yevgeniy Dodis) holds a Ph.D. in Computer Science from MIT, has served as a Full Professor of Computer Science at NYU for well more than a decade, and is also a Fellow of the International Association for Cryptologic Research. Plaintiff's executives are listed

inventors on dozens of cryptography-related patents, and widely revered as leaders in the industry.

11.    In 2018, Qrypt was founded with the intent to provide cutting-edge solutions in the realm of digital privacy and security. As advances in quantum computing are made, existing security solutions fail to guarantee that data remains uncompromised. Qrypt was created to protect and defend the privacy of individuals and organizations by ensuring that data remains secure, even in the era where vulnerabilities are sure to increase due to the capabilities of quantum computing.

12.    Plaintiff uses the QRYPT Mark to promote a variety of cybersecurity-related offerings, specifically intended to protect against the threat to encryption posed by quantum computers. Such offerings include, *inter alia*, quantum entropy-as-a-service (QEaaS), quantum entropy appliance (QEA), quantum-secure IPsec gateways, digital quantum key distribution (dQKD), and post-quantum cryptographic key generation (collectively, the Plaintiff's "Goods and Services"). These technologies are built upon proprietary hardware and software architectures that generate truly random entropy, which are delivered via secure APIs to enable one-time pad encryption and other quantum-secure applications.

13.    Anticipating that the QRYPT-branded Goods and Services would be introduced in the foreseeable future, on August 30, 2017, Plaintiff made constructive use of the QRYPT Mark when it filed an intent-to-use trademark application with the United States Patent and Trademark Office ("USPTO") for the standard character word mark in International Class 042 for the following services:

Data encryption and decoding services; Providing temporary use of non-downloadable software for data encryption, decryption, cryptography and computer user authentication; Providing temporary use of on-line non-downloadable cloud computing software for use in secure messaging and file, data and document storage, transfer, and sharing; Providing temporary use of non-downloadable computer software for data encryption and data management; Platform as a service (PAAS) featuring computer software platforms for sending secure messages between users

14.     The USPTO approved the above-referenced trademark application and the QRYPT Mark was not opposed by any members of the public. The USPTO issued a Notice of Allowance on October 1, 2019, Plaintiff submitted its specimens and Statement of Use on September 30, 2022, and the QRYPT Mark was registered as U.S. Reg. No. 6,901,358 (the "'358 Registration") on November 15, 2022. A true and correct copy of the '358 Registration, as accessed through the USPTO's Trademark Status & Document Retrieval system, is attached hereto as Exhibit B.

15.     The '358 Registration is valid, subsisting, and in full force and effect, serving as *prima facie* evidence of Plaintiff's ownership of the QRYPT Mark, as well as Plaintiff's exclusive right to use the same.

16.     Plaintiff's use—both within the United States and abroad—of the inherently distinctive, coined QRYPT Mark for its Goods and Services has been substantially exclusive and continuous since its operations began several years ago. As such, Plaintiff owns valid and subsisting federal statutory and common law trademark rights in the QRYPT Mark.

17.     Since the QRYPT Mark was first used in commerce in 2022, Plaintiff's proprietary quantum-secure encryption tools and methods have become widely regarded as setting the curve in the industry, with the company receiving a multitude of awards for its innovative work in the data privacy and security sector. The QRYPT Mark is well-known in

its field and recognized among customers and stakeholders, including government contractors, large enterprises, and institutions in the cybersecurity space. It has engaged in consistent brand promotion through national and international conferences, strategic partnerships with U.S. national laboratories and other private parties, and thought leadership in the area of quantum cryptography.

18.    The QRYPT brand has become a valuable asset for Plaintiff. Specifically, by virtue of the use, advertising, promotion, distribution, and sale of Plaintiff's Goods and Services under the QRYPT name over several years, the QRYPT Mark has come to be widely recognized as identifying the highly innovative technologies sourced from or otherwise associated or affiliated with Plaintiff. As a result, the QRYPT Mark has become a distinctive identifier of Plaintiff's Goods and Services in the minds of consumers and in Plaintiff's trade. The QRYPT Mark symbolizes the valuable goodwill that Plaintiff has built through extensive use, investment, research, and commercial success.

19.    In addition to natural brand recognition developed through word-of-mouth advertising and a strong social media presence, Qrypt has implemented structured marketing and industry relationship strategies to promote its Goods and Services through a broad spectrum of trade and advertising channels. For example, Qrypt and its officers have participated in and spoken at more than thirty events in the past eighteen months, ranging from flagship industry conferences with tens of thousands of attendees, like the annual RSA Conference in San Francisco and Nvidia's GPU Technology Conference (where Qrypt was one of only fifty companies out of thousands of partners selected for the Inception Pavilion). Qrypt and its officers are also regular attendees at invitation-only government forums, such as the Quantum

Tech Expo at Fort Meade and the DoD Cybersecurity Summit. Mr. Mandich has been a Forbes Technology Council member since 2021, with over 20 published articles, and was a keynote speaker at Inside Quantum Technology's inaugural Quantum + AI conference.

20.     Moreover, Qrypt is frequently the subject of unsolicited press releases from major institutions like Palo Alto Networks and the Department of Energy. Much of the dialogue pertains to Qrypt's technical achievements and the advances in the field, including those that are described within Qrypt's robust (and still expanding) patent portfolio.

21.     Qrypt's target consumers include any organizations or individuals for whom quantum-secure communications and data storage is a necessity, including but not limited to large enterprises and government agencies. Qrypt has established numerous significant partnerships and collaborations, and is currently working with several agencies of the U.S. government, banking and financial industries, leading technology companies, and commercial communications enterprises, among others. Qrypt's Goods and Services are regularly used by enterprise leaders such as CISOs and CTOs, cybersecurity teams, and developers.

22.     Because of the high degree of inherent distinctiveness of the QRYPT Mark, the length of time and extent to which Plaintiff has used the QRYPT Mark, the substantial territory in which the QRYPT Mark has been and continues to be used, and the high degree of consumer recognition of the QRYPT Mark, the name "QRYPT" has become a well-known trademark, widely recognized by the consuming public and members of the trade as a designation of the source of Plaintiff's Goods and Services, and has therefore has been deserving of a broad scope of legal protection since long before any date of first use to which Defendant may point.

**II.       Defendant and its Infringing Activity**

23.       Upon information and belief, Defendant purports to be a direct competitor of Plaintiff, as its primary focus is not only on encryption-related offerings, but forms of encryption which are resistant to attacks from quantum computers.

24.       Specifically, upon information and belief, taking the representations on Defendant's Website as true, Defendant is in the business of providing "permanent post-quantum readiness" by "protecting enterprises from the quantum threat—today, tomorrow, and beyond." Defendant additionally claims to be "the global leader in enterprise post-quantum security advisory, providing vendor-neutral cryptographic risk solutions for financial institutions, governments, and high-risk industries." Defendant allegedly provides "enterprise-grade security solutions designed to safeguard infrastructures before, during, and after Q-Day." These services purportedly include quantum penetration testing, post-quantum cryptography transitioning, construction of quantum-resilient enterprise architectures, and monitoring and reporting services for ongoing quantum security risk detection. *See* Exhibit A and Exhibit C (which is a true and correct screenshot of the website displayed at www.qryptonic.com/solutions). In sum, upon information and belief, most if not all of Defendant's offerings as described on Defendant's Website are the same as or closely related to the Goods and Services provided by Plaintiff under the QRYPT Mark, and the presentation of such services on Defendant's Website is extraordinarily similar to the presentation of the corresponding services on Plaintiff's website, qrypt.com (hereafter, "Plaintiff's Website," a true and correct screenshot of the landing page for which is attached hereto as Exhibit D).

25.     Notwithstanding the promotions described in the preceding paragraph, and in stark contrast to the experiences of Plaintiff's executives, upon information and belief, Defendant has no meaningful experience, whether academic or practical, in cybersecurity, quantum encryption, data privacy, or any related industry.

26.     Upon information and belief, Defendant's leadership consists exclusively of Jason Nathaniel Ader ("Mr. Ader"), who allegedly serves as the Chief Innovation Officer of Defendant.[1] Upon information and belief based upon publicly available records, and contrary to Defendant's representations on its website and in online publications, Mr. Ader is a former hedge fund manager with no educational or industrial experience related to the realm of quantum encryption or data security. *See generally Katzeff v. SpringOwl Asset Mgmt., LLC*, No. 654741/2023 (N.Y. Sup. Ct. filed 2023) *and Ader v. Ader et al.*, No. 653917/2024 (N.Y. Sup. Ct. filed 2024).

27.     Upon information and belief, as of the filing of this Complaint, neither Mr. Ader nor any other agent of Defendant, if any exist, has engaged any individuals with the relevant experiences and credentials to warrant the claims of expertise in the realms of cybersecurity, data privacy, and quantum encryption as touted on Defendant's Website.

---

[1] Plaintiff notes that the seemingly sponsored content published in various online channels by Defendant and/or Mr. Ader inconsistently refers to the entity behind the QRYPTONIC brand and Mr. Ader's role in the organization. For example, several sources state that another entity associated with Mr. Ader (SpringOwl Technology Partners) "has acquired a controlling stake in Qryptonic Inc., a leader in quantum-powered cybersecurity…" while also simultaneously stating that Mr. Ader is a co-founder. *See* Exhibit E. Other social media posts from Defendant's accounts refer to another related entity, Qryptonic Research, LLC. *See* Exhibit F. Upon information and belief, no such entities exist in the New York, Florida, or any other Secretary of State databases, with the only hits under the name "qryptonic" pertaining to the listed Defendant. According to the Florida Secretary of State records, the publications referenced in this footnote predate the actual formation of any Qryptonic entity by several weeks. *See* Exhibit G.

Nowhere on Defendant's Website or in Defendant's social media content is a single individual with a relevant academic or professional background mentioned; all links that invite viewers of Defendant's Website to contact Defendant for more information about its quantum-encryption-related services route to a generic contact form, with no indication as to whom would be addressing the inquiry.

28.     Defendant's Infringing Mark—QRYPTONIC—is confusingly similar to Plaintiff's registered QRYPT Mark. From a visual perspective, both coined terms contain and/or begin with the unique base word "qrypt"; Defendant's addition of the suffix "-onic" operates as a nondistinctive modifier of the coined term, similar to the way the same suffix operates in words like "electronic," "bionic," etc. Relatedly, the aural presentation of both terms is substantially similar, as the emphasis in pronunciation will be on the dominant term "qrypt," rather than the nondistinctive suffix "-onic." The impression created upon the prospective consumer who encounters both terms is likewise indistinguishable, with both parties using the coined term "qrypt" to allude to the term "crypt." The word "crypt" is derived from the Greek root word "kryptos," which means something hidden or secretive (and operates as the etymological bridge for more modern terms such as crypto, cryptography, etc.). Said differently, QRYPT and QRYPTONIC create similar meanings and commercial impressions, as both suggest associations with hidden and/or secretive tech- and data-security-related offerings.

29.     Without Plaintiff's authorization, and upon information and belief, beginning after Plaintiff acquired protectable exusive rights in the QRYPT Mark, Defendant adopted and began using the Infringing Mark in U.S. commerce.

30.     Specifically, upon information and belief, Defendant's use of the Infringing Mark to promote its goods and services began no earlier than October of 2024, and in any event not prior to Plaintiff's constructive use priority date (*i.e.*, the filing date of the federal trademark application for QRYPT).

31.     Plaintiff has attempted to notify Defendant of concerns arising out of Defendant's use of the Infringing Mark. In response, Defendant (through an email allegedly sent by Defendant's Head of PR & Media Relations, Jessica Gold) asserted that no remedial measures would be implemented. Instead, Defendant threatened legal action against Plaintiff if it did not "withdraw this meritless claim." Shortly thereafter, Defendant, through Mr. Ader, began messaging members of Plaintiff's Board of Advisors with an apparent intent to obtain information pertaining to Plaintiff's operations by asking questions on topics such as Plaintiff's contracts with Los Alamos National Laboratory and Oak Ridge National Laboratory, its product launches, and its reports on the efficacy of Plaintiff's Goods and Services.

32.     Upon information and belief, as evidenced by Defendant's promotion of its services on its website and its actions discussed in the previous paragraphs, Defendant's adoption and continued use of the Infringing Mark was and is a deliberate attempt to palm off on the goodwill Plaintiff has generated in the QRYPT Mark, or otherwise misappropriate the reputation fostered by Plaintiff in the QRYPT Mark.

33.     Consumer confusion is highly likely when even a basic search in Google for Defendant's name and location populates results for Plaintiff's business listing. *See* Exhibit H.

34.     There is no relationship between Plaintiff and Defendant, and Plaintiff has never authorized or consented to Defendant's use of the Infringing Mark.

### III.     Defendant's Unlawful Registration and Use of Defendant's Website

35.     Upon information and belief, on or about October 25, 2024, Defendant registered the domain name qryptonic.com with the registrar Squarespace Domains LLC (the "Registrar"). While the registrant's name is listed as "redacted for privacy," the registrant section of the ICANN registration data lookup tool lists Defendant's mis-designated juristic entity.[2] Attached hereto as Exhibit I is a true and correct copy of the ICANN WHOIS record for the Defendant's Website.

36.     The Domain Name is confusingly similar to Plaintiff's QRYPT Mark, which was distinctive and widely known in the relevant industry when Defendant registered the Domain Name. Upon information and belief, Defendant was aware of Plaintiff's rights in the QRYPT Mark when it selected and registered the Domain Name, and knowingly and intentionally registered the Domain Name because of its similarity to the QRYPT Mark.

37.     Upon information and belief, Defendant has no rights in or to any trademark or name that is similar to the Domain Name and is not known by any name that is similar to the Domain Name. Upon information and belief, Defendant had no legitimate purpose for

---

[2] As noted in the previous footnote, upon information and belief, Defendant has interchangeably used the designations "Qryptonic Inc." and/or "Qryptonic Research, LLC" in place of Qryptonic LLC, even though no such entites appear to exist. The same pattern seems to have taken place for the registration of the domain name at issue, despite the fact that Qryptonic LLC was not formed until months after the Defendant's Website was registered under the name of Qryptonic Inc.

registering the Domain Name and did so only with bad faith intent to profit from the goodwill in the Plaintiff's QRYPT Mark and from use of the Domain Name as set out herein.

38.     Without Plaintiff's authorization and, upon information and belief, beginning after Plaintiff acquired protectable exclusive rights in the QRYPT Mark, Defendant posted a live website at the Domain Name. Defendant's Website remains active as of the filing of this Complaint.

39.     Defendant's questionable representations on its website and in its social media posts closely track the genuine representations presented by Plaintiff on its website, which fortifies the determination that Defendant's Website was designed with knowledge and deliberate intent to replicate the credibility of Plaintiff's Website. For example, both parties' websites feature similar pages directed to case studies, research, partnerships, and affiliations with well-known institutions. *Compare* Exhibits A and C *with* Exhibit D. Unlike Plaintiff's Website, Defendant's Website provides no substantiation for the claims made thereon, and does not so much as identify the individuals to whom inquiries regarding highly technical and sensitive quantum security offerings would be directed.

40.     Upon information and belief, Defendant used the Domain Name, which is confusingly similar to Plaintiff's QRYPT Mark, to divert internet users looking for Plaintiff's Website to Defendant's Website. Upon further information and belief, Defendant used the Domain Name with bad faith intent to financially benefit by passing itself off as one and the same, or otherwise creating the erroneous impression that it is authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff. Upon information and belief, Defendant's activity was at least partially intended to

drive sales of a book that was independently published by Mr. Ader in January of 2025, which is entitled "The Quantum Almanac 2025–2026: Leadership, Innovation, and Survival in the Post–Q Day Era" and sells on Amazon for $99. A direct link to the sales page for Mr. Ader's book is featured on the "services" page of Defendant's Website. *See* Exhibit C.

41.     Because the Domain Name is confusingly similar to the QRYPT Mark, and because Defendant's Website promotes and depicts services that are closely related, if not identical, to Plaintiff's Goods and Services offered under the QRYPT Mark in a manner that is strikingly similar to the way in which Plaintiff promotes its Goods and Services, consumers are likely to be confused into thinking that Plaintiff authorized, approved, or is affiliated or connected with Defendant's Website and the services promoted on the site, when that is not the case.

42.     Due to the similarity of the Domain Name and Plaintiff's distinctive QRYPT Mark, consumers are likely to associate the Domain Name with Plaintiff's Mark, impairing the distinctiveness of Plaintiff's Mark. Upon information and belief, Defendant intended its use of a Domain Name so similar to Plaintiff's distinctive QRYPT Mark to cause consumers to associate the Domain Name with Plaintiff's Mark.

43.     Upon information and belief, Defendant's acts alleged herein are willful, with the deliberate intent to trade on the goodwill of Plaintiff's QRYPT Mark, cause confusion and deception online and in the marketplace, divert internet users looking for Plaintiff's Website or Plaintiff's Goods and Services under the QRYPT Mark to Defendant's Website.

44.     Defendant's acts are causing, and unless restrained, will continue to cause damage and immediate irreparable harm to Plaintiff and to its valuable reputation and goodwill with the consuming public for which Plaintiff has no adequate remedy at law.

## COUNT I – FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)

45.     Plaintiff repeats and realleges the preceding paragraphs 1 through 44 of this Complaint as if fully set forth herein.

46.     Defendant's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendant's services, and is likely to cause consumers to believe, contrary to fact, that Defendant's services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff. Defendant's conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

47.     Upon information and belief, Defendant has committed the foregoing acts of infringement with full knowledge of Plaintiff's prior rights in the QRYPT Mark and with the willful intent to cause confusion and trade on Plaintiff's goodwill.

48.     Defendant's conduct is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both damage Plaintiff and confuse the public unless enjoined by this court. Plaintiff has no adequate remedy at law.

49.     Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys'

fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT II – FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125(a))

50.     Plaintiff repeats and realleges the preceding paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.     Defendant's unauthorized use in commerce of the Infringing Mark as alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Defendant's services, and is likely to cause consumers to believe, contrary to fact, that Defendant's services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff.

52.     Defendant's unauthorized use in commerce of the Infringing Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

53.     Upon information and belief, Defendant's conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendant with Plaintiff.

54.     Defendant's conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

55.     Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to both

damage Plaintiff and confuse the public unless enjoined by this court. Plaintiff has no adequate remedy at law.

56.     Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT III – CYBERSQUATTING (15 U.S.C. § 1125(d))

57.     Plaintiff repeats and realleges the preceding paragraphs 1 through 56 of this Complaint as if fully set forth herein.

58.     Plaintiff owns all rights in and to the QRYPT Mark, which is commercially strong and conceptually distinctive, and was commercially strong and conceptually distinctive as of the date that Defendant registered the Domain Name.

59.     Defendant registered and used the Domain Name with an intent to profit from its confusing similarity to Plaintiff's QRYPT Mark. Among other things, upon information and belief:

    a.  Defendant registered the Domain Name, despite knowing that Defendant had no rights in any name or mark and was not known by any name that was referenced or reflected in the Domain Name;

    b.  Defendant made no bona fide, non-infringing, commercial use or fair non-commercial use of the Domain Name;

    c.   Defendant intended to divert consumers looking for Plaintiff's Goods and Services online to Defendant's Website by exploiting the confusing similarity of the Domain Name and the QRYPT Mark for Defendant's commercial gain;

    d.   Defendant knowingly provided false contact information to the Registrar when registering the Domain Name by listing the registrant organization as an entity which did not and still does not exist; and

    e.   Defendant's Website attempts to utilize similar representations, claims, and stylistic presentations to create an appearance of credibility and expertise in the industry in a way which parallels the structure of Plaintiff's Website.

60.    Defendant's conduct is directly and proximately causing substantial, immediate, and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to damage Plaintiff unless enjoined by this court. Plaintiff has no adequate remedy at law.

61.    Plaintiff is entitled to injunctive relief pursuant to 15 U.S.C. §§ 1116 and 1125(d)(1)(C), including, among other injunctive relief, transfer of the Domain Name to Plaintiff.

62.    Plaintiff is further entitled to recover its damages and Defendant's profits, enhanced as the court deems appropriate and equitable, in amounts to be proven at trial, pursuant to 15 U.S.C. § 1117(a). Alternatively, Plaintiff is entitled to maximum statutory damages in the amount of $100,000 for the Domain Name pursuant to 15 U.S.C. § 1117(d).

63.     Upon information, Defendant knowingly provided materially false information to the registrar in connection with its registration of the Domain Name, which triggers the presumption of a willful violation pursuant to 15 U.S.C. § 1117(e).

64.     Plaintiff is entitled to recover its attorneys' fees and costs, together with pre-judgment and post-judgment interest.

## COUNT IV – TRADEMARK DILUTION (N.Y. GEN. BUS. LAW § 360-l)

65.     Plaintiff repeats and realleges the preceding paragraphs 1 through 64 of this Complaint as if fully set forth herein.

66.     Plaintiff's QRYPT Mark is distinctive to both the consuming public and Plaintiff's trade.

67.     Plaintiff has expended substantial time, money, and resources marketing, advertising, and promoting the Goods and Services sold under the QRYPT Mark.

68.     The Infringing Mark adopted and used by Defendant is, as alleged herein, at least substantially similar to Plaintiff's QRYPT Mark.

69.     Defendant's unauthorized use in commerce of the Infringing Mark as alleged herein, including in New York, has diluted and, unless enjoined, is likely to continue to dilute the distinctive quality of Plaintiff's QRYPT Mark in violation of section 360-l of the New York General Business Law.

70.     Defendant's unauthorized use in commerce of the Infringing Mark as alleged herein, including in New York, has caused and is likely to cause consumers to attribute

unfavorable characteristics to Plaintiff's QRYPT Mark and ultimately associate Plaintiff's

QRYPT Mark with inferior—or worse, unsecure—services, thereby undermining and

damaging the valuable goodwill associated therewith and causing injury to Plaintiff's business

reputation in violation of section 360-l of the New York General Business Law.

71.     Defendant's acts, as alleged herein, are, upon information and belief,

intentional and willful, and have caused and, unless enjoined, will continue to cause

irreparable damage to Plaintiff, which has no adequate remedy at law.

72.     Plaintiff is entitled to injunctive relief and reasonable attorneys' fees under

N.Y. Gen. Bus. Law § 360-l.

## <u>COUNT V – COMMON LAW INFRINGEMENT AND UNFAIR COMPETITION</u>

73.     Plaintiff repeats and realleges the preceding paragraphs 1 through 72 of this

Complaint as if fully set forth herein.

74.     Plaintiff owns valid and subsisting common law trademark rights to the

QRYPT Mark for its Goods and Services as alleged herein.

75.     As alleged herein, Plaintiff has expended substantial time, skill, labor, and

money in the creation and marketing of its Goods and Services under the QRYPT Mark in

New York, and selling and providing such Goods and Services under the QRYPT Mark in

New York, and has therefore acquired legally protectable rights in the QRYPT Mark.

76.     Through its unauthorized use of and advertising and offering of services under

the Infringing Mark as alleged herein, including in New York, Defendant has unfairly traded

21
COMPLAINT
CASE NO.: 1:25-cv-5275

on and misappropriated the goodwill and reputation created and developed by Plaintiff in the QRYPT Mark.

77.    As alleged herein, upon information and belief, Defendant, without authorization, falsely and deceptively used the Infringing Mark in New York to advertise and/or provide its own services in violation of Plaintiff's rights under New York common law.

78.    Defendant's unauthorized use of the Infringing Mark as alleged herein has caused and is likely to continue to cause confusion and deceive consumers as to the origin, source, sponsorship, or affiliation of Defendant's services, and is likely to cause consumers to believe, contrary to fact, that Defendant's services are sold, authorized, endorsed, or sponsored by Plaintiff, or that Defendant is in some way affiliated with or sponsored by Plaintiff, all in violation of Plaintiff's rights under New York common law.

79.    Upon information and belief, Defendant's acts as alleged herein were committed with full knowledge of Plaintiff's prior rights in the QRYPT Mark, willfully, deliberately, and in bad faith.

80.    Defendant's conduct alleged herein constitutes trademark infringement and unfair competition under New York common law, as provided for in N.Y. Gen. Bus. Law § 360(o).

81.    Defendant's conduct as alleged herein is causing immediate and irreparable harm and injury to Plaintiff, and to its goodwill and reputation, and will continue to damage Plaintiff unless enjoined by this court. Plaintiff has no adequate remedy at law.

82.     Plaintiff is entitled to injunctive relief, actual and compensatory damages in an amount to be determined at trial, disgorgement of profits, attorneys' fees, costs, and pre-judgment and post-judgment interest.

## COUNT VI – DECEPTIVE TRADE PRACTICES (N.Y. GEN. BUS. LAW § 349)

83.     Plaintiff repeats and realleges the preceding paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     Defendant's unauthorized use of the Infringing Mark as alleged herein, including in New York, has the capacity to deceive and is deceiving the public as to the source or sponsorship of Defendant's services. As a result, the public has been and will continue to be damaged.

85.     Defendant's conduct alleged herein constitutes deceptive acts or practices in the conduct of a business, trade or commerce, or the furnishing of a service, in violation of Section 349 of the New York General Business Law.

86.     Upon information and belief, Defendant's conduct alleged herein was willful.

87.     Defendant's conduct is causing irreparable injury to Plaintiff and to its goodwill and reputation and will continue to both damage Plaintiff and deceive the public unless enjoined by this Court. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant as follows:

1.    Entering a judgment declaring that:

    a.  Qrypt's federal trademark rights in the QRYPT Mark have been and continue to be infringed by Defendant's use of the QRYPTONIC mark in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114);

    b.  Defendant's use of the QRYPTONIC mark constitutes federal unfair competition in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a));

    c.  Defendant has violated Section 43(d) of the Lanham Act by virtue of its bad faith registration and use of the Domain Name;

    d.  Defendant's use of the QRYPTONIC mark violates N.Y. Gen. Bus. Law § 360-l;

    e.  Defendant's use of the QRYPTONIC mark constitutes trademark infringement under New York common law;

    f.  Defendant's use of the QRYPTONIC mark constitutes unfair competition under New York common law; and

    g.  Defendant's use of the QRYPTONIC mark constitutes a deceptive trade practice in violation of N.Y. Gen. Bus. Law § 349.

2.    Ordering Defendant to, within ten (10) days of the entry of final judgment, transfer to Plaintiff registration of the Domain Name and registrations of any other domain names owned or controlled by Defendant that are confusingly similar to Plaintiff's QRYPT Mark (collectively, the "Prohibited Domain Names")

3.    Granting an injunction temporarily, preliminarily, and permanently enjoining the Defendant, its employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries, and assigns, and all of those in active concert and participation with any

of the foregoing persons and entities who receive actual notice of the Court's order by personal service or otherwise from:

a.  providing, selling, marketing, advertising, promoting, or authorizing any third party to provide, sell, market, advertise, or promote any goods or services under the mark QRYPTONIC or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of Plaintiff's QRYPT Mark;

b.  engaging in any activity that infringes Plaintiff's rights in its QRYPT Mark;

c.  engaging in any activity constituting unfair competition with Plaintiff;

d.  engaging in any activity that is likely to dilute the distinctiveness of Plaintiff's QRYPT Mark;

e.  making or displaying any statement, representation, or depiction that is likely to lead the public or the trade to believe that (i) Defendant's services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Plaintiff, or (ii) Plaintiff's Goods and Services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by, or associated, affiliated, or otherwise connected with Defendant;

f.  using or authorizing any third party to use in connection with any business, goods, or services any false description, false representation, or false designation of origin, or any marks, names, words, symbols, devices, or trade dress that falsely associate such business, goods and/or services with Plaintiff or tend to do so;

g.  registering or applying to register any trademark, service mark, domain name, trade name, or other source identifier or symbol of origin consisting of or incorporating

the mark QRYPTONIC or any other mark that infringes or is likely to be confused with Plaintiff's QRYPT Mark, or any goods or services of Plaintiff, or Plaintiff as their source;

h.  owning, registering, trafficking in, or otherwise using any of the Prohibited Domain Names; and

i.  aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-paragraphs (a) through (h).

4.  Directing Defendant to immediately and permanently cease all display, marketing, advertising, promotion, sale, offer for sale, and/or use of any and all advertisements, displays, and other materials that feature or bear any designation or mark incorporating the mark QRYPTONIC or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of Plaintiff's QRYPT Mark.

5.  Directing that Defendant immediately and permanently delete all social media accounts associated with the QRYPTONIC mark, including but not limited to the following accounts:

a.  Youtube: @Qryptonic-USA

b.  Instagram: qryptonic_

c.  X: @Qryptonic_

d.  Substack: @qryptonic

6.  Directing that Defendant immediately take down or otherwise instruct the proper third-party recipient to take down all online publications and press releases related to Defendant's QRYPTONIC-branded services.

7.    Directing, pursuant to Section 35(a) of the Lanham Act (15 U.S.C. § 1116(a)), Defendant to file with the court and serve upon Plaintiff's counsel within thirty (30) days after service on Defendant of an injunction in this action, or such extended period as the court may direct, a report in writing under oath, setting forth in detail the manner and form in which Defendant has complied therewith.

8.    Granting such other and further relief as the Court may deem proper to prevent the public and trade from deriving the false impression that any goods or services sold, distributed, marketed, advertised, promoted, or otherwise offered or circulated by Defendant are in any way approved, endorsed, licensed, sponsored, or authorized by, or associated, affiliated, or otherwise connected with Plaintiff or constitute or are connected with Plaintiff's Goods and Services.

9.    Awarding Plaintiff, upon Plaintiff's election, either:

a.    an amount up to three times the amount of its actual damages and all of Defendant's profits realized by its wrongful acts alleged herein, enhanced as appropriate to compensate Plaintiff for the damages caused thereby, in accordance with Section 35(a) and (b) of the Lanham Act (15 U.S.C. § 1117(a), (b)); or

b.    maximum statutory damages in the amount of $100,000 for Defendant's willful violation of Section 43(d) of the Lanham Act (15 U.S.C. § 1125(d)), in accordance with Section 35(d) of the Lanham Act (15 U.S.C. § 1117(d)).

10.    Awarding Plaintiff punitive and exemplary damages as the court finds appropriate to deter any future willful infringement.

11.    Declaring that this is an exceptional case pursuant to Section 35(a) of the Lanham Act and awarding Plaintiff its costs and reasonable attorneys' fees thereunder (15 U.S.C. § 1117(a)).

12.    Awarding Plaintiff interest, including pre-judgment and post-judgment interest, on the foregoing sums.

13.    Awarding such other and further relief as the Court deems just and proper.


Dated: June 24, 2025                          Respectfully submitted,
Knoxville, Tennessee
                                              **LEGALFORCE RAPC WORLDWIDE P.C.**

                                              _____

                                              _____
                                              Derrick M. Davis, Esq. (*pro hac vice forthcoming*)
                                              Derrick@trademarkia.com
                                              Pablo E. Segarra, Esq.
                                              Pablo@trademarkia.com
                                              446 E. Southern Ave
                                              Tempe, AZ 85282
                                              (650) 390-6402
                                              *Attorneys for Plaintiff*