IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QRYPT INC., | |
| Plaintiff, | |
| v. | Case No.: 1:25-cv-5275-AKH |
| QRYPTONIC LLC, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
WITH TEMPORARY RESTRAINING ORDER**

TRUST TREE LEGAL, P.C.

Derrick M. Davis, Esq., TN BPR No. 037122 (*pro hac vice*)
derrick@trusttree.com

Kevin P. Hartley, Esq., TN BPR No. 029199 (*pro hac vice*)
kevin@trusttree.com

798 Berry Road #41400
Nashville, Tennessee 37204
Telephone: (865) 867-7500
Facsimile: (865) 867-7500

*Attorneys for Plaintiff, Qrypt Inc.*

<u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................................... 2

II.  STATEMENT OF FACTS ...................................................................................... 4

III.  ARGUMENT ......................................................................................................... 6

  A.  Defendant's Post-Suit Escalation Has Created an Imminent Risk of Irreparable Harm. ...... 7

  B.  Plaintiff is Likely to Succeed on its Lanham Act Claims. .................................... 8

    1.  The QRYPT Mark is Conceptually and Commercially Strong. ...................................... 10

    2.  The Infringing Mark is Substantially Similar to the QRYPT Mark. .............................. 13

    3.  The Parties' Products and Services are Highly Related if not Identical, and Directly
        Competitive; Qrypt is Likely to "Bridge the Gap"; Consumer Sophistication does not
        Sufficiently Mitigate Risk of Confusion .......................................................... 13

    4.  Actual Confusion is not a Prerequisite to a Finding that Confusion is Likely. ............... 17

    5.  Qryptonic Adopted its Mark in Bad Faith. .................................................... 19

    6.  Qryptonic's Offerings are of Comparatively Poor Quality or Completely Illegitimate. . 22

  C.  Qrypt is Also Likely to Prevail on its State Law and Cybersquatting Claims. .................. 23

  D.  Qrypt is Entitled to a Presumption of Irreparable Harm in the Absence of an Injunction. 24

  E.  The Balance of Hardships Favors Plaintiff. ...................................................... 25

  F.  An Order Enjoining Defendant's Activities Will Serve the Public Interest....................... 25

  G.  Plaintiff's Request for the Security Bond Requirement to be Waived is Appropriate, and
      Its Alternative Request to Set a Bond in the Amount of $2500 is Adequate. .................... 26

IV.  CONCLUSION ..................................................................................................... 26

DECLARATIONS AND EXHIBITS

**Declaration of Kevin Chalker**

Exhibit 1 - Screenshot of Qrypt Website (Bios)
Exhibit 2 - Screenshot of Qrypt Website (Partners)
Exhibit 3 - Definition of "Crypt"
Exhibit 4 - DoE Press Release
Exhibit 5 - Feb. 18, 2025 C&D to Qryptonic
Exhibit 6 - Feb. 25, 2025 Response to C&D Letter
Exhibit 7 - Screenshot of Qryptonic Website (Landing Page)
Exhibit 8 - Screenshots of Activity Notifications on Qryptonic Website
Exhibit 9 - Screenshot of Qryptonic Website (Case Studies)
Exhibit 10 - Screenshot of Qryptonic Website (Services)
Exhibit 11 - Screenshot of Qryptonic Website (About)
Exhibit 12 - Screenshot of Qryptonic Website (Leadership)
Exhibit 13 - TSDR Printout of Ader Trademark Application
Exhibit 14 - Screenshot of Qryptonic Press Release
Exhibit 15 - Screenshot of Qryptonic Press Release
Exhibit 16 - Screenshot of Qryptonic Press Release
Exhibit 17 - Screenshot of Prospectus for 26 Capital Acquisition Corp.

## TABLE OF AUTHORITIES

**CASES**

*Ader v. Ader*, 2025 NY Slip Op 33045(U), at 1 (Sup. Ct. N.Y. Cnty. July 29, 2025) (Cohen, J.) . 2

*American Express Nat'l Bank v. Ader*, No. 2025-013579-CA-01 (Fla. Cir. Ct. 11th Jud. Cir., filed July 16, 2025) ............................................................................................................ 2

*Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384 (2d Cir. 1995)...................................... 18

*BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185 (S.D.N.Y. 2000) ..................... 10

*Cadbury Bevs., Inc. v. Cott Corp.*, 73 F.3d 474 (2d Cir. 1996)............................................... 14, 22

*Centaur Communs., Ltd. v A/S/M Communs., Inc.*, 830 F.2d 1217 (2d Cir. 1987) ..................... 14

*Charles of the Ritz*, 832 F.2d 1317 (2d Cir. 1987).......................................................................... 20

*City of N.Y. v. Lopez*, No. 21 CV 7862 (JPO), 2021 U.S. Dist. LEXIS 243449 (S.D.N.Y. Dec. 21, 2021)......................................................................................................................................... 24

*City of New York v. Henriquez*, 98 F.4th 402 (2d Cir. 2024)........................................................... 6

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996).......................................................... 26

*Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v Steinway & Sons*, 523 F.2d 1331 (2d Cir. 1975).......................................................................................................................................... 16

*Guthrie Healthcare Sys. v ContextMedia, Inc.*, 826 F.3d 27 (2d Cir. 2016) ............................... 18

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497 (2d Cir. 1996)...................... 14, 23

*Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153 (7th Cir. 1984) ........................................... 16

*In re 26 Capital Acquisition Corp.*, No. 25-11323-KBO (Bankr. D. Del., filed July 11, 2025) .... 2

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023) .................................................................... 6

*Juicy Couture, Inc. v Bella Intl., Ltd.*, 930 F. Supp 2d 489 (S.D.N.Y. 2013).............................. 22

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224 (2d Cir. 1992)............................................................................................................................................ 6

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867 (2d Cir. 1986)...................... 18

*Mattel, Inc. v. 86755, et al.*, No. 18-cv-8825-RJS-JSR (S.D.N.Y. Oct. 4, 2018) ........................ 26

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254 (2d Cir. 1987)................................ 20

*Morningside Group, Ltd. v Morningside Capital Group, L.L.C.*, 182 F.3d 133 (2d Cir .1999) . 14, 16

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514  (S.D.N.Y. 2013) .............. 23

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010) ....... 25

*Nikon Inc. v. Ikon Corp.*, 987 F.2d 91 (2d Cir. 1993).................................................................... 23

*Paddington Corp. v Attiki Importers & Distribs.*, 996 F.2d 577 (2d Cir. 1993) ......................... 20

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ......................................... 9

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91 (2d Cir. 1985) .................. 4

*RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112 (2d Cir. 2022) ................................ 6

*Star Indus. v Bacardi & Co.*, 412 F.3d 373 (2d Cir. 2005) ........................................ 20

*Stern's Miracle-Gro Prods. v. Shark Prods.*, 823 F. Supp. 1077 (S.D.N.Y. 1993) ...................... 18

*Streetwise Maps v VanDam, Inc.*, 159 F.3d 739 (2d Cir. 1998) .................................... 10

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) ........................................ 9

*Vans, Inc., et al. v. Walmart, Inc., et al.*, 21-cv-01876 (KES) Dkt. 65 (C.D. Cal. Mar. 31, 2022) ............................................................................................................ 24

*Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141 (2d Cir. 2003) ...................................... 22

*Vitarroz v. Borden, Inc.*, 644 F.2d 960 (2d Cir. 1981) ............................................ 14

*Winter v. NRDC, Inc.* 555 U.S. 7, (2008) .................................................... 6

## RULES

Fed. R. Civ. P. 65 ........................................................................................ 1, 26

## STATUTES

15 U.S.C. § 1057(b) ........................................................................................ 9

15 U.S.C. § 1057(c) ........................................................................................ 9

15 U.S.C. § 1072 .......................................................................................... 20

15 U.S.C. § 1114 .......................................................................................... 24

15 U.S.C. § 1116(a) ...................................................................................... 24

15 U.S.C. § 1117(e) ...................................................................................... 21

15 U.S.C. § 1125(d)(1) .................................................................................. 8

Pursuant to the Federal Rules of Civil Procedure, Plaintiff Qrypt Inc. ("Plaintiff" or "Qrypt") submits this memorandum in support of its Motion for Preliminary Injunction with Temporary Restraining Order (Qrypt's "Motion") against Defendant Qryptonic LLC ("Qryptonic").[1] As discussed below, Qrypt is likely to succeed on the merits of its claims, and respectfully requests that the Court enter an Order:

1. Requiring Qryptonic to show cause why a preliminary injunction should not be issued enjoining its continued infringement of Qrypt's federally registered QRYPT mark (the "QRYPT Mark");

2. Temporarily restraining Qryptonic, pending a hearing on the preliminary injunction, from:

    a. using the mark QRYPTONIC or any other mark confusingly similar to QRYPT;

    b. advertising, marketing, promoting, selling, or offering to sell any goods or services under the QRYPTONIC mark;

    c. holding itself out as affiliated with, sponsored by, or associated with Qrypt in any manner;

    d. taking any action to further commercialize, expand, or promote its business under the infringing mark;

    e. publishing or causing to be published any articles on the topics of quantum encryption, cybersecurity, and digital privacy; and

    f. soliciting, engaging, hiring, and contracting with any third parties for the purposes of partnering with, advising, or working for Qryptonic in connection with advertising, marketing, promoting, selling, or offering to sell any goods or services under the QRYPTONIC mark;

3. Waiving the security bond requirement under Rule 65(c), or alternatively setting a nominal bond in the amount of $2,500; and

4. Granting such other and further relief as the Court deems just and proper.

---

[1] Qrypt intends to file a Motion to Amend the Complaint to add Mr. Ader as a party in short order. For the purposes of this Motion, Qrypt seeks injunctive relief against Qryptonic, which inherently binds Mr. Ader pursuant to Fed. R. Civ. P. 65 (d)(2).

## I.    INTRODUCTION

What started as a standard trademark infringement dispute against a nascent party has quickly turned into a nefarious affair. This case began in a familiar way. After Qrypt discovered the unauthorized use of the confusingly similar QRYPTONIC mark (the "Infringing Mark"), Qrypt sent a cease-and-desist letter to Qryptonic to explain Qrypt's rights and request that Qryptonic discontinue use of the Infringing Mark. *See* Declaration of Kevin Chalker, dated January 20, 2026 ("Chalker Decl.") ¶¶ 16-17, Ex. 5. Qryptonic responded hostilely and dismissively, refusing to comply with the reasonable demands in the letter. *Id.* at ¶¶ 18-19.

Qryptonic's refusal forced Qrypt to proceed with this litigation. Until recently, Qrypt did not believe Qryptonic's actions presented a threat of *immediate* and irreparable harm, making any request for injunctive relief premature. *Id.* at ¶ 20. Rather, based on Qryptonic's barebones website and the many public disputes related to Qryptonic's founding member, Jason Ader ("Mr. Ader"),[2] Qrypt viewed Qryptonic as a nuisance rather than a genuine competitor. *Id.*

Qryptonic's early litigation conduct reinforced Qrypt's view. Rather than filing a substantive response to the Complaint (DE # 5), Qryptonic submitted a procedurally deficient Motion to Dismiss for Lack of Jurisdiction (DE # 20), which the Court denied (DE # 33). Shortly

---

[2] Mr. Ader and the entities he controls have been involved in several high-profile lawsuits related to fraud allegations, mismanagement, and financial woes. Representative examples include: (i) pending bankruptcy proceedings for 26 Capital Acquisition Corp., *In re 26 Capital Acquisition Corp.*, No. 25-11323-KBO (Bankr. D. Del., filed July 11, 2025) (pending); (ii) a lawsuit filed by American Express National Bank for more than $370,000 in unpaid credit card debt, *American Express Nat'l Bank v. Ader*, No. 2025-013579-CA-01 (Fla. Cir. Ct. 11th Jud. Cir., filed July 16, 2025) (pending); (iii) and a lawsuit initiated by Mr. Ader's mother for Mr. Ader's mismanagement of his late father's estate, *Ader v. Ader*, 2025 NY Slip Op 33045(U), at 1 (Sup. Ct. N.Y. Cnty. July 29, 2025) (Cohen, J.). Qrypt requests that the Court take judicial notice of the lawsuits against Mr. Ader and his entities, which demonstrate that Mr. Ader's prior dealings bear no relation to the highly technical realm of quantum computing, and that any goods or services Qryptonic now offers under the Infringing Mark are likely to cause reputational damage to Qrypt based on any association with Qryptonic or Mr. Ader.

thereafter, Qryptonic's counsel represented to undersigned counsel that the case was likely headed towards mediation.[3] From Qrypt's perspective, this matter appeared to be a routine intellectual property dispute moving toward resolution.

Since the Motion to Dismiss was denied, Qryptonic has drastically changed course. In the process of preparing for the upcoming Case Management Conference, Qrypt learned that Qryptonic had taken deliberate measures to bolster its reputation and, seemingly, to offer competing services under the Infringing Mark. For example, Qryptonic's website (i) highlights the recent addition of several plausibly credible members to a newly formed advisory board, (ii) makes detailed claims about investigations conducted for clients and its offerings to potential clients, and (iii) displays pop-up notifications several times a minute that claim a company has engaged with Qryptonic regarding some inquiry or commitment to procure Qryptonic's products, services, or information. *See* Chalker Decl. ¶¶ 21-28, Exs. 7-12. Indeed, it appears Qryptonic is making a public relations push to enhance the company's visibility. *Id.* at ¶ 31, Exs. 14-16.

Perhaps most significantly, Qrypt recently learned that Mr. Ader filed a federal trademark application[4] for the QRYPTONIC logo (U.S. App. Serial No. 99/488,074) in his individual capacity—months *after* this action was filed and days after the Court denied Qryptonic's Motion to Dismiss. *Id.* at ¶¶ 29-30, Ex. 13. This brazen action and the recent efforts to raise Qryptonic's profile created an immediate need for Qrypt to act.

---

[3] Qrypt does not provide this fact as an indication or admission of wrongdoing by Qryptonic. Instead, Qrypt provides it to support its mental state during the earlier stages of this dispute.

[4] The trademark application filed by Mr. Ader prominently displays the literal element "QRYPTONIC" and seeks rights in connection with "Downloadable computer software for encryption" and "Computer security consultancy in the field of scanning and penetration testing of computers and networks to assess information security vulnerability." *See* Chalker Decl. ¶ 21, Ex. 8 (TSDR printout for Ser. No. 99/488,074).

Qryptonic's and Mr. Ader's recent actions did not preserve the *status quo*; they altered it. Qryptonic's post-suit escalation transformed what was once a *potential* threat of irreparable harm into an *imminent* one. Absent immediate injunctive relief, Qrypt will lose control over its reputation and the goodwill associated with the QRYPT Mark. The harm caused by such a loss of control is "not calculable nor precisely compensable," which makes an award of monetary damages alone an inadequate remedy. *See Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985).

## II.    STATEMENT OF FACTS

Qrypt is an industry leader in the rapidly evolving realm of quantum-based digital privacy and security. *See* Chalker Decl. ¶¶ 3-13. Founded in 2017, Qrypt was formed to protect and defend the privacy of individuals and organizations by ensuring that data remains secure as advances in quantum computing are made. Chalker Decl. ¶¶ 3-4. As stated in the Complaint (DE # 5, ¶¶ 9-22) and reflected on Qrypt's website—and as one would expect for a company that specializes in quantum encryption and data privacy—Qrypt's officers and board of advisors possess impressive credentials and decades' worth of experience in the fields of physics and computer science. Chalker Decl. ¶¶ 5-6, Ex. 1. Many members of the Qrypt team have backgrounds in national security, cyberinfrastructure, and international public policy. *Id.* The collective experiences of the Qrypt team have led the company to engage in exclusive, global partnerships with world-renowned research labs (*e.g.*, Oak Ridge National Laboratory and Los Alamos National Laboratory), prominent leaders in the tech sector (*e.g.*, Nvidia), and educational institutions (*e.g.*, EPFL, a Swiss-based institute of technology). *Id.* at ¶¶ 7-8.

These exemplary success stories are a direct byproduct of the time and energy devoted by the highly competent members of Qrypt's roster to the company's endeavors and to its products and services—all of which have been promoted under the QRYPT Mark since the company's

4

inception. *Id.* at ¶¶ 9-13. In this way, the QRYPT Mark has become synonymous with trust in the evolving, nuanced, and sensitive intersection of data security and quantum computing. *Id.* Qrypt has obtained a federal registration for the QRYPT Mark, which specifically covers quantum-computing-based cybersecurity-related services. *Id.* at ¶ 14.

Qryptonic's business is a very different story. While Qryptonic purportedly offers quantum computing and cybersecurity services, Mr. Ader's Wall Street background has little—if any—relation to those highly technical fields. According to the prospectus for one of Mr. Ader's other entities:

> Jason Ader is the co-founder and Chief Executive Officer of SpringOwl Asset Management LLC. Founded in 2013, SpringOwl is a New York-based SEC-registered asset management firm and independent sponsor leading corporate turnarounds, with a particular focus on the real estate, gaming and lodging sectors.

*Id.* at ¶ 32, Ex. 17. Qrypt's understanding is that Mr. Ader is the sole member (or at least managing member) of Qryptonic LLC. Qrypt doubts that Mr. Ader possessed any legitimate expertise in quantum computing or cybersecurity when he formed the entity, published a book entitled "The Quantum Almanac 2025-2026" (*see* DE # 5-3), and registered the domain qryptonic.com.

Until recently, Qrypt was likewise skeptical that Qryptonic legitimately provided the services it promotes under the Infringing Mark or that Qryptonic was actually affiliated with the industry partners listed on its website. Chalker Decl. ¶ 20. Curiously, at some point in the past few months—and seemingly coinciding with the Court's ruling in Qrypt's favor on the Motion to Dismiss—the Qryptonic website was updated to remove references to Mr. Ader and to focus on accolades of many seemingly knowledgeable individuals with experience in the cybersecurity and quantum encryption industries. *See* Chalker Decl. ¶¶ 21-28, Exs. 7-12. Taking these changes at face value, Qryptonic no longer appears to be the nascent (and uncredentialed) organization it

was at the outset of litigation. Qryptonic has taken concrete steps to legitimize itself in Qrypt's industry. This change, combined with Mr. Ader's brazen trademark filing, threatens Qrypt with immediate and irreparable harm.

### III.    ARGUMENT

Qrypt is entitled to a temporary restraining order and preliminary injunction against Qryptonic to prevent immediate and irreparable harm to its rights in the QRYPT Mark.

The Second Circuit applies two similar standards to determine whether a party is entitled to injunctive relief. Under one standard, the party seeking a preliminary injunction must establish: (i) that it is likely to succeed on the merits, (ii) that it is likely to suffer irreparable harm in the absence of preliminary relief, (iii) that the balance of equities tips in its favor, and (iv) that an injunction is in the public interest. *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 667 (2d Cir. 2023) (quoting *Winter v. NRDC, Inc.* 555 U.S. 7, 20 (2008)). Under the other standard, the moving party must establish (i) irreparable harm, (ii) either a likelihood of success on the merits *or* both serious questions on the merits and a balance of hardships decidedly favoring the moving party, and (iii) that injunctive relief is in the public interest. *See, e.g.*, *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022); *City of New York v. Henriquez*, 98 F.4th 402 (2d Cir. 2024). Under either test, the "standards which govern consideration of an application for a temporary restraining order… are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992).

Qrypt is entitled to the relief it seeks in the Motion under either standard. Qrypt is both likely to succeed against Qryptonic *and* raises serious questions on the merits with the balance of hardships or equities in favoring Qrypt. Qrypt is also entitled to a presumption of irreparable harm under the Lanham Act that cannot be rebutted by Qrypontic, and an order enjoining

Qryptonic's activities will serve the public interests. Therefore, Qrypt meets the standard for a preliminary injunction, and the Court should enter a temporary restraining order pending its final ruling on the preliminary injunction.

### A. Defendant's Post-Suit Escalation Has Created an Imminent Risk of Irreparable Harm.

Irreparable harm in trademark cases arises when a defendant's conduct threatens a mark owner's control over its goodwill and reputation. When this action was filed, Qryptonic appeared to be, at most, a marginal, dormant, or sham actor. Chalker Decl. ¶ 20. The company's various profiles and sponsored content distributed across the internet emanated from Mr. Ader and not a credible figure with experience in the relevant industry. Moreover, Qryptonic's content was seemingly AI-generated "substance-lite," with the actor(s) responsible for Qryptonic's promotional activity struggling to keep the company's name straight. *See, e.g.*, DE # 5, ¶ 27, fn. 1.

Simply put, when Qrypt filed this lawsuit to stop Qryptonic's unauthorized use of an Infringing Mark, there was a threat of irreparable harm, but not an *imminent* threat given the illusory nature of Qryptonic's business. Nothing about Qryptonic's conduct through the first few months of this litigation signaled its intent to aggressively commercialize the services offered under the Infringing Mark. That posture has changed.

Rather than maintaining the *status quo*, Qryptonic has affirmatively escalated its conduct. *See, e.g.*, Chalker Decl. ¶ 23-24, Ex. 8. Mr. Ader and Qryptonic have not proceeded with the caution of a defendant in a trademark infringement lawsuit. Instead, they have doubled down by continuing to use the Infringing Mark to build the business, attempting to add credibility to the organization and bolstering legal protections for the Infringing Mark in Mr. Ader's name.

These intervening actions present an imminent threat of impairing Qrypt's ability to control its brand and the goodwill embodied in the QRYPT Mark. Each new public use of the Infringing Mark increases the likelihood of consumer confusion and compounds reputational harm—particularly in an industry where trust and credibility are paramount. Once such confusion takes hold, it cannot be reliably remedied by an award of monetary damages.

This is not a case involving static or historical infringement. It is a case in which Defendant's post-suit conduct has materially altered the risk calculus and created an imminent threat of irreparable harm. Qrypt seeks immediate injunctive relief to prevent the erosion of its trademark rights while this case proceeds.

### B.  Plaintiff is Likely to Succeed on its Lanham Act Claims.

Qrypt's claims relate to Qryptonic's unlawful, unauthorized, and deceptive use of the Infringing Mark. The factors underpinning the test for trademark infringement under the Lanham Act generally overlap with the factors for the other causes of action alleged in the Complaint.[5] Because the scope of the injunction sought in this Motion would enjoin activity that presents a risk of harming Qrypt's rights under the Lanham Act, Qrypt will focus on the test for infringement of a federally registered trademark in this Circuit.

To succeed on trademark infringement claims, a plaintiff must show that its marks are valid and entitled to protection, and that a defendant's use of the plaintiff's marks is likely to

---

[5] For example, to prevail on a cybersquatting claim under the Lanham Act, a plaintiff may show that the defendant registered a domain name that is confusingly similar to the plaintiff's mark with bad-faith intent to profit. *See* 15 U.S.C. § 1125(d)(1). The defendant's "provision of material and misleading false contact information when applying for the registration of the domain name" is a factor for Courts to consider when determining whether the defendant acted in bad faith. 15 U.S.C. § 1125(d)(1)(B)(i)(VII). The arguments and facts supporting Qrypt's trademark infringement claims likewise support Qrypt's cybersquatting claim under the Lanham Act, as well as the state law claims directed to dilution and deceptive trade practices.

cause confusion. *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010). The U.S. trademark registration certificate submitted in conjunction with the Complaint and this Motion provides *prima facie* evidence of both the validity of the QRYPT Mark, as well as Qrypt's ownership of the same. 15 U.S.C. § 1057(b); *See also* DE # 5, ¶¶ 14-15; DE # 5-2. Qrypt's rights in the QRYPT Mark date back to at least August 30, 2017, *i.e.*, the constructive date of first use. 15 U.S.C. § 1057(c).[6] DE # 5, ¶¶ 14-15; DE # 5-2. Qrypt's priority date precedes Qryptonic's purported date of first use by many years, making Qrypt the clear senior user. Chalker Decl. ¶ 23. As such, the QRYPT Mark is entitled to protection.

To determine whether consumer confusion is likely, this Circuit considers the *Polaroid* factors: (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the owner will bridge the gap; (5) evidence of actual confusion; (6) defendant's good faith in adopting the mark; (7) the quality of defendant's product; and (8) the sophistication of the consumers. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (internal citations omitted). These factors are not

---

[6] Section 7(c) of the Lanham Act states as follows:

> Contingent on the registration of a mark on the principal register provided by this chapter, *the filing of the application to register such mark shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect, on or in connection with the goods or services specified in the registration against any other person* except for a person whose mark has not been abandoned and who, prior to such filing—
> (1) has used the mark;
> (2) has filed an application to register the mark which is pending or has resulted in registration of the mark; or
> (3) has filed a foreign application to register the mark on the basis of which he or she has acquired a right of priority, and timely files an application under section 1126(d) of this title to register the mark which is pending or has resulted in registration of the mark.

15 U.S.C. § 1057(c) (emphasis added).

always dispositive, and other factors may be added or initial factors abandoned. *Streetwise Maps v VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

The likelihood of confusion standard (i) protects a plaintiff's investment in a mark and (ii) shields consumers from deception. *See, e.g., BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 193 (S.D.N.Y. 2000) ("A close reading of pertinent cases, statutes and commentary suggests some of the basic ends trademark law seeks to achieve and the values it strives to promote and protect. Most prominent among these are to encourage honest business competition and to recognize and reward commercial creativity, investment, diligence, initiative and good faith, weighed against certain interests of the public, when making purchasing choices, to be protected from confusion, mistake and deception.").

### 1. The QRYPT Mark is Conceptually and Commercially Strong.

Trademark strength is typically gauged by two metrics: conceptual strength and commercial strength. The distinctiveness spectrum, which attempts to categorically identify the scope of protection to which a mark is entitled based on the characteristics of the mark as used in connection with the goods or services at issue, is the most common method of analyzing conceptual strength. Marks on the descriptive end of the spectrum are deemed conceptually weak and afforded a more limited scope of protection. Alternatively, suggestive, arbitrary, or fanciful marks are viewed as inherently distinctive and are thus entitled to a stronger scope of protection.

The QRYPT Mark is inherently distinctive. The QRYPT Mark is coined or fanciful, having no obvious meaning in any language, despite its loose circumstantial relation to the term "quantum encryption." Specifically, QRYPT was derived from the words "quantum encryption" by combining the letter "Q" from "quantum" with the letters "rypt" from "encryption," resulting in a term with no independent or commonly understood meaning. Chalker Decl. ¶ 10. Like MICROSOFT (a portmanteau of "microcomputer" and "software") and NETFLIX (derived from

a combination of "internet" and "flicks"), QRYPT is as conceptually strong as a mark can be—and is thus entitled to the strongest scope of protection.

In the alternative, if construed as a pseudo-mark (*i.e.*, a mark which is an intentionally altered or misspelled version of a word), the word "crypt" is still arbitrary as used in connection with Qrypt's offerings. *Id.*, Ex. 3. The ordinary meanings of the word "crypt" include a chamber wholly or partly underground (most often taking the form of vault under the main floor of a church), a chamber in a mausoleum, an anatomical pit or depression, or a simple tubular gland. *Id.* Just as APPLE is arbitrary as used in connection with phones and computers, QRYPT (if viewed as a pseudo-mark) is arbitrary as used in connection with quantum computing and cybersecurity solutions.

The QRYPT Mark is likewise commercially strong. Since Qrypt began using the QRYPT Mark, Qrypt's proprietary quantum-secure encryption tools and methods have been recognized as setting the industry standard, with the company receiving numerous awards for its innovative work in data privacy and security. *See* Chalker Decl. ¶¶ 5-13. The QRYPT Mark is well-known in its field and recognized by customers and stakeholders, including government contractors, large enterprises, and institutions in the cybersecurity space as a source identifier for goods and services provided by Qrypt. *Id.* at ¶¶ 7, 11-13. Indeed, the QRYPT Mark has been used to promote Qrypt's goods and services at national and international conferences, in strategic partnerships with U.S. national laboratories and other private parties, and for thought leadership in quantum computing and cybersecurity. *Id.* at ¶¶ 7-13. Through these efforts, the QRYPT Mark has come to be widely recognized by consumers and in Qrypt's trade as identifying the highly innovative and reliable technologies provided by Qrypt. *Id.* at ¶ 13. The QRYPT Mark

symbolizes the valuable goodwill that Qrypt has built through extensive use, investment, research, and commercial success. *Id.*

In addition to brand recognition developed through word-of-mouth advertising and a strong social media presence, Qrypt has implemented structured marketing and industry relationship strategies to promote its products and services through a broad spectrum of trade and advertising channels. *Id.* at ¶¶ 7-13. For example, Qrypt and its officers have participated in and spoken at dozens of events in the past two years, including flagship industry conferences with tens of thousands of attendees, such as the annual RSA Conference in San Francisco and Nvidia's GPU Technology Conference (where Qrypt was one of only fifty companies out of thousands selected for the Inception Pavilion). *Id.* at ¶ 11. Qrypt and its officers are also regular attendees at invitation-only government forums, such as the Quantum Tech Expo at Fort Meade and the Department of Defense's Cybersecurity Summit. *Id.* Denis Mandich, Qrypt's Chief Technology Officer and co-founder, has been a Forbes Technology Council member since 2021, has authored over 20 published articles, and has been a keynote speaker at Inside Quantum Technology's inaugural Quantum + AI conference. *Id.* Moreover, Qrypt is frequently the subject of high-profile press releases from major institutions like Palo Alto Networks and the Department of Energy. *Id.* at ¶ 12, Ex. 4. Much of the dialogue pertains to Qrypt's technical achievements and advances in the field, including those described within Qrypt's robust (and expanding) patent portfolio. *Id.*

Because the QRYPT Mark is both conceptually and commercially strong, the first *Paloroid* factor favors Qrypt. Therefore, Qrypt is entitled to broad protection, including the injunctive relief requested.

**2.    The Infringing Mark is Substantially Similar to the QRYPT Mark.**

Because the first letter-string in the Infringing Mark, QRYPTONIC, wholly comprises the QRYPT Mark, the second *Polaroid* factor favors Qrypt.

From a visual perspective, both marks begin with the unique literal element "qrypt"; Qryptonic's addition of the suffix "-onic" to the coined term created by Qrypt operates as a nondistinctive modifier, similar to the way the suffix operates in words like "electronic," or "bionic." The aural presentation of both terms is substantially similar, as the emphasis in pronunciation will be on the dominant element "qrypt," rather than the nondistinctive suffix "-onic." The impression created upon the prospective consumer who encounters either term is indistinguishable, with both parties using Qrypt's coined term "qrypt" in a fanciful or arbitrary manner relative to their goods and services.

Simply put, QRYPT and QRYPTONIC are similar with respect to sight, sound, and meaning. The marks create similar commercial impressions, as both are used as fanciful or arbitrary terms that play on the phonetically similar but definitionally distinct term "crypt" to reference their data-security-related offerings. Therefore, the marks are substantially similar to one another, and the second *Polaroid* factor favors Qrypt.

**3.    The Parties' Products and Services are Highly Related if not Identical, and Directly Competitive; Qrypt is Likely to "Bridge the Gap"; Consumer Sophistication does not Sufficiently Mitigate Risk of Confusion**

The parties offer directly competitive services to the same classes of consumers through the same market channels using similar if not identical marketing methods; however, to the extent Qryptonic's services (as well as consumers, market channels, or advertising tactics) are distinguishable, they are within the zone of natural expansion of Qrypt's current offerings, and Qrypt is likely to offer those goods and services in the future. Because these aspects of Qrypt's

operations implicate the third, fourth, and eighth *Polaroid* factors, the analysis of each will be consolidated here.

The third *Polaroid* factor "concerns whether and to what extent the two [services] compete with each other" and "the nature of the [services] themselves and the structure of the relevant market…" *Morningside Group, Ltd. v Morningside Capital Group, L.L.C.*, 182 F.3d 133, 140 (2d Cir .1999) (citing *Cadbury Bevs., Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)). "Among the considerations germane to the structure of the market are the class of customers to whom the [services] are sold, the manner in which the [services] are advertised, and the channels through which the [services] are sold." *Cadbury*, 73 F.3d at 480. The fourth *Polaroid* factor inquires whether a plaintiff is likely to enter defendant's market, or "bridge the gap" and recognizes "the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996) (citation omitted). The eighth *Polaroid* factor seeks to identify the sophistication of the relevant purchasers. *See Centaur Communs., Ltd. v A/S/M Communs., Inc.*, 830 F.2d 1217, 1228 (2d Cir. 1987). The sophistication element has been labeled as "analogous" to the proximity factor. *See Vitarroz v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981). As with the first two *Polaroid* factors, the third, fourth, and eighth factors support Qrypt's argument that confusion is likely.

Qryptonic purports to be a direct competitor of Qrypt, as its primary focus is on encryption-related offerings and forms of encryption that are resistant to attacks from quantum computers. Chalker Decl. ¶¶ 21-28, 31. Statements on each party's website remove any doubt about the proximity of the services. Qrypt's webpage states that "Qrypt's quantum-secure encryption gives people the tools they need to immutably secure their data and their right to

14

privacy. Through great partnerships and an unmatched team pedigree, we have built patented encryption methods and applications that allow everyone to reclaim their right to digital autonomy." Chalker Decl. ¶ 6, Ex. 1. Similarly, Qryptonic's services page advertises "Comprehensive cryptographic assessment, testing, and migration services that address both immediate vulnerabilities and future quantum threats." Chalker Decl. ¶ 26, Ex. 10. Both parties provide highly interconnected, if not identical, services targeted towards the same consumer base and operate in the same market channels using similar marketing strategies; the offerings are both related and proximate. To the extent that the parties' offerings are distinguishable, they are highly interrelated, as they seek to address similar risks using related tools and methods, meaning that Qrypt is likely to offer any distinguishable services Qryptonic promotes under the Infringing Mark in the foreseeable future.

Moreover, the sensitive nature of cybersecurity and data integrity—much less the subset of the industry that focuses on the challenges presented in the quantum era and solutions thereto—creates a marketplace dynamic driven by trust, relationships, and reputation. The following excerpt from *Morningside* is on point:

> [T]he nature of the financial investment market renders the proximity of the two company's services particularly troubling in likelihood-of-confusion terms. High-level investment business is commonly conducted based on trust and personal relationships among individuals. If any investor reads about a Morningside Capital investment--such as the Carson Products acquisition--and mistakes that transaction for a Morningside Group investment of which it was not aware, it may well feel "cut out" of a potentially lucrative deal. Unless it communicates with someone at Morningside Group to express its displeasure and thus discovers its mistake, its business relations with Morningside Group could be soured. In that market, then, even positive publicity for Morningside Capital could cause business problems and lost opportunities for Morningside Group. And it is of course obvious that adverse consequences for Morningside Group could also flow from a converse scenario--unfavorable publicity attendant on a Morningside Capital transaction.

> Indeed, as stated in a different context, there may be "no effective way to measure the loss of sales or potential growth--to ascertain the people who don't knock on the

door or to identify the specific persons who do not [return] because of the existence
of the infringer" (*Hyatt Corp. v. Hyatt Legal Services*, 736 F.2d 1153, 1158 (7th
Cir. 1984) (citation omitted)). Direct competition between the parties, when
coupled with the personal nature of the investment market, makes it likely both that
confusion would occur and that it would harm Morningside Group.

*Morningside*, 182 F.3d at 140-141.

As discussed in this Memorandum, Qrypt has genuine concerns about the authenticity of

the representations on Qryptonic's website and in its sponsored content, which is promoted

across various online forums. If Qryptonic is legitimately offering goods and services under the

Infringing Mark as it represents, Qrypt has concerns regarding their quality and any false

association with Qrypt. It is foreseeable that Qrypt's prospective or current clients may

mistakenly associate Qryptonic's or Mr. Ader's business dealings with Qrypt. In an industry

where ensuring that the integrity of a client's most sensitive information remains intact is

paramount, any news related to Qryptonic's operations—good or bad—could harm Qrypt. It is

foreseeable that Qrypt's reputation could be harmed not only because a consumer mistook

Qryptonic's goods or services for Qrypt's goods or services, but also because one of Qrypt's

clients could become disgruntled or lose trust if they are misled into believing that Qrypt has

started working with one of the client's competitors after gaining access to sensitive information

about the client's business.

While the heightened sophistication of the typical purchaser can cut against a finding of

likelihood of confusion, that is not the case here. The Second Circuit has held that consumer

sophistication can *increase* the likelihood of confusion, depending on the market and the

products. *See, e.g.*, *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v Steinway & Sons*, 523

F.2d 1331, 1342 (2d Cir. 1975) (holding that a sophisticated consumer base—purchasers of high-

end pianos—may nonetheless be drawn to purchasing a junior user's products based on the reputation built up by the senior user and some perceived connection between the companies).

Like the purchaser of high-quality musical instruments in *Steinway & Sons*, the fact that the typical consumer at the present time may be comparatively sophisticated and presumably knows how to vet the technical competency of those who provide the goods and services at issue increases the risk of confusion rather than mitigating it. The addition of advisors to the Qryptonic team make it likely that a prospective consumer may attempt to search for the high-quality services Qrypt provides, mistakenly click on Qryptonic's website, review the offerings Qryptonic purports to provide, assess the facially legitimate credentials of those individuals affiliated with Qryptonic, and then proceed to pay Qryptonic for whichever products or services they need despite initially seeking Qrypt. Moreover, the demand for and availability of quantum-computing-centric security solutions are rapidly increasing. As such, the risk of confusion will rise as the number of actual and potential consumers in the market expands, given that consumers are more likely to be confused in emerging markets.

As in *Morningside*, the direct competition between the parties (or alternatively, the likelihood that Qrypt will in the future offer the same goods or services Qryptonic promotes under the Infringing Mark), the personal and sensitive nature of the relevant industry, and the sophisticated nature of the typical consumer make it likely that confusion will occur, all to Qrypt's detriment. As such, the third, fourth, and eighth *Polaroid* factors support a finding that confusion is likely to occur.

### 4.  Actual Confusion is not a Prerequisite to a Finding that Confusion is Likely.

The fifth *Polaroid* factor relates to actual confusion. While evidence of actual confusion may carry much weight when introduced, "the absence of evidence of actual confusion does not

necessarily prove anything, especially when there has been neither long nor significant experience of the two trademarks operating side-by-side in the same market." *Guthrie Healthcare Sys. v ContextMedia, Inc.*, 826 F.3d 27, 44 (2d Cir. 2016). Moreover, "it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986). *See also Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995) (stating that the issue of actual confusion is "not dispositive of the question of likelihood of confusion"). This Court has recognized that it would be unfair to penalize a trademark owner for acting to protect its trademark rights before serious damage has occurred, and thus that the lack of evidence of actual confusion does not substantially weaken a plaintiff's position where the totality of the circumstances suggests that confusion is likely. *See Stern's Miracle-Gro Prods. v. Shark Prods.*, 823 F. Supp. 1077, 1087 (S.D.N.Y. 1993) (citing *Lois Sportswear U.S.A., Inc.*, 799 F.2d at 875).

Qrypt has numerous reasons to doubt the veracity of the representations Qryptonic makes regarding any products or services it allegedly provides under the Infringing Mark. *See* Chalker Decl. ¶¶ 20-21, 23-24. Furthermore, Qrypt has reason to believe that Qryptonic's generically advertised "case studies" are wholly fabricated and that neither the company nor Mr. Ader can offer the solutions listed on the Qryptonic website. *Id.* at ¶21, 25, Ex. 8. If Qrypt's suspicions are correct, it is not surprising that it is not yet aware of instances of actual confusion.

Even if Qryptonic is providing the solutions it advertises, the parties have not been competing against one another for a substantial amount of time, and the pool of potential consumers has historically been shallow. Specifically, according to the information included in Mr. Ader's trademark application for the QRYPTONIC logo, the mark was first used to promote

Qryptonic's goods and services in October of 2024. *Id.* at ¶ 30, Ex. 13. Given that the average American consumer has historically not been focused on eliminating data vulnerabilities arising out of developments in quantum computing, the number of potential relevant consumers for goods and services like those offered by Qrypt and advertised by Qryptonic has been comparatively small to date. The market dynamics before the technology was abundantly available and widely used by a variety of consumers simply would not create a situation where strong evidence of actual confusion would be expected.

Notwithstanding the foregoing, Qrypt does have evidence of general confusion in the marketplace. As stated in the Complaint, the data affiliated with the parties' online profiles has been conflated in the past, *e.g.*, results for a Google search for "qryptonic llc new york" displayed the Qryptonic's website and other related links alongside Qrypt's business profile and address. *See* DE # 5-8. This suggests there has been consumer confusion, even if it has not yet been reported to Qrypt. The risk of confusion will only grow as demand for Qrypt's services increases.

As such, the lack of extensive evidence of actual consumer confusion does not prove that confusion is unlikely. On the contrary, because basic internet searches for the one party's name yields results for the other, actual confusion is likely to have already occurred, or at least is likely to occur soon. As in *Stern's Miracle-Gro Prods.*, Qrypt should not be penalized for trying to protect its rights simply because abundant evidence of actual confusion has not been obtained, and therefore, the fifth *Polaroid* factor is neutral.

### 5. Qryptonic Adopted its Mark in Bad Faith.

The next *Polaroid* factor inquires whether the defendant adopted its mark in bad faith, *i.e.*, whether there was "an attempt by a junior user of a mark to exploit the goodwill and reputation of a senior user by adopting the mark with the intent to sow confusion between the

two companies' [services]." *Star Indus. v Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005). The Second Circuit has stated that "[i]n determining a defendant's intent, 'actual or constructive knowledge' of the prior user's mark… may indicate bad faith." *Paddington Corp. v Attiki Importers & Distribs.*, 996 F.2d 577, 587 (2d Cir. 1993) (citing *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987)). Moreover, "[w]here such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred," the Second Circuit has upheld findings of bad faith. *Paddington Corp.*, 996 F.2d at 587 (citing *Pegasus*, 818 F.2d at 258-59 *and Charles of the Ritz*, 832 F.2d 1317, 1318-20, 1322 (2d Cir. 1987).

First, pursuant to the Lanham Act, registration of the QRYPT Mark serves as constructive notice of Qrypt's claim of ownership thereof. *See* 15 U.S.C. § 1072. At a minimum, Qryptonic had constructive notice of Qrypt's rights for years prior to Qryptonic's alleged provision of services under the Infringing Mark, given that the application for the QRYPT Mark was filed in 2017 and the registration was issued on November 15, 2022.

Second, as alleged in the Complaint and described in the foregoing sections, it appears likely that Qryptonic or Mr. Ader also had actual knowledge of Qrypt's rights and prior use of the QRYPT Mark when Qryptonic adopted the Infringing Mark. *See* DE # 5 at ¶ 39. The similarities between the Infringing Mark and the coined QRYPT Mark are striking, and the parallels between the parties' goods and services and their marketing strategies are unlikely to be pure coincidence. Qryptonic's updated website format further supports this argument, particularly given the bolstered roster of advisors, enhanced detail on case studies, and questionable pop-up notifications that Qryptonic undoubtedly uses to create a sense of excitement and credibility around its goods and services. *See* Chalker Decl. ¶¶ 21-28, Exs. 7-12.

Additional events, when placed on the timeline, lend credibility to Qrypt's arguments. For example, the website through which Qryptonic's goods and services are promoted using the Infringing Mark (qryptonic.com) was registered on October 25, 2024. DE # 5-9. The domain registrant's name was listed as "Qryptonic Inc." *Id.* Upon information and belief, the entity Qryptonic Inc. does not— nor has it ever—existed. The defendant listed in this lawsuit, Qryptonic LLC, was not formed until January 29, 2025, *i.e.*, *more than three months after* the website was registered. DE # 5-7. Inherently, the statements made by Qryptonic and/or Mr. Ader to the registrar when the website qryptonic.com was registered constitute knowing and willful misrepresentations of material facts, triggering the presumption of a willful violation under 15 U.S.C. § 1117(e).[7]

All facts considered, it is more likely than not that Qryptonic or Mr. Ader had actual knowledge of Qrypt's rights in the QRYPT Mark when Qryptonic adopted and began using the Infringing Mark. Even if this is not the case, Qryptonic indisputably had constructive notice of Qrypt's ownership of the QRYPT Mark when these activities occurred, and it is beyond cavil that Qryptonic was aware of Qrypt's rights when it committed the post-litigation escalation discussed in this Memorandum. Qryptonic's material misrepresentations in connection with registration of its website further demonstrate its bad-faith adoption of the Infringing Mark. Therefore, the sixth *Polaroid* factor favors Qrypt.

---

[7] 15 U.S.C. § 1117(e) states, in relevant part, "[i]n the case of a violation referred to in this section, it shall be a rebuttable presumption that the violation is willful for purposes of determining relief if the violator, or a person acting in concert with the violator, knowingly provided or knowingly caused to be provided materially false contact information to a domain name registrar, domain name registry, or other domain name registration authority in registering, maintaining, or renewing a domain name used in connection with the violation."

###### 6.    Qryptonic's Offerings are of Comparatively Poor Quality or Completely Illegitimate.

The seventh *Polaroid* factor requires the Court to inquire "whether the senior user's reputation could be tarnished by [the] inferior [services] of the junior user." *Cadbury*, 73 F.3d at 483 (citations omitted). "As a result, this factor 'goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion.'" *Juicy Couture, Inc. v Bella Intl., Ltd.*, 930 F. Supp 489, 502 (S.D.N.Y. 2013) (quoting *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 152 (2d Cir. 2003)).

Qrypt (once again) maintains that Qryptonic, or Mr. Ader, simply did not have the requisite competency or technical capability to provide the solutions listed on the Qryptonic website at the time this lawsuit was filed. Chalker Decl. ¶¶ 20-21, 32. Whatever technical know-how Mr. Ader or Qryptonic may have had or may now have, Qrypt asserts that Qryptonic's competency pales in comparison to the aggregate qualifications and industry experience held by the Qrypt team. Qryptonic and Mr. Ader appear to have taken Qrypt's skepticism to heart, given the recent updates to its website and recruitment of affiliates who do appear to have a legitimate background in the relevant fields. Chalker Decl. ¶¶ 21-28, Exs. 7-12. Despite these changes, Qrypt remains doubtful that Qryptonic is walking the walk. For example, the new webpage indicates Qryptonic has SOC2, ISO, CMMC certifications and "FedRAMP readiness," yet the actual certificates one would expect to be displayed are nowhere to be found. Chalker Decl. ¶¶ 21-22, Ex. 7. Having recently undergone its audits, Qrypt has direct knowledge of how painstaking the process is to obtain such certifications, and is confident that it would be impossible for a company—even one staffed by an army of engineers and security experts—to successfully navigate these reviews within a year. Chalker Decl. ¶ 21.

However, even if Qryptonic is providing the goods and services it claims to offer, it is worth reiterating that Qrypt is widely known and highly regarded as an industry leader in the quantum encryption sector. Chalker Decl. ¶¶ 3-13, Exs. 1-4. In an industry rooted in trust and expertise, Qrypt has put in the work over many years to establish itself as the premier provider of quantum-computing-centric cybersecurity solutions, which has built significant goodwill in the minds of the consuming public. *Id.* Any services Qryptonic may theoretically provide would be substandard compared to those offered under the QRYPT Mark.

As a final alternative, even if Qryptonic does provide the goods and services listed on its website, and even if those goods and services are of the same quality of Qrypt's services, this factor still supports a finding of likelihood of confusion. "The quality of a junior user's [services] can be relevant in two ways: (1) an inferior [service] may cause injury to the plaintiff trademark owner because people may think that the senior and junior [services] came from the same source; or (2) *[services] of equal quality may tend to create confusion as to source because of this very similarity*." *Hormel Foods Corp.*, 73 F.3d at 505 (emphasis added). *See also Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 95 (2d Cir. 1993) (stating that "a product of equal quality promotes confusion that they come from the same source"). If the goods and services are of the same quality, that fact only enhances the probability that consumers will be confused as to the source given the similarity of the parties' marks.

### C. Qrypt is Also Likely to Prevail on its State Law and Cybersquatting Claims.

Because Qrypt has shown a likelihood of success on its Lanham Act claims, Qrypt is also likely to succeed on its New York unfair competition and trademark infringement claims. *See N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 521 (S.D.N.Y. 2013). Likewise, the facts and arguments raised herein show that Qrypt is likely to succeed, or

otherwise has raised serious questions on the merits and a balance of hardships decidedly in its favor, on its claims regarding trademark dilution and deceptive trade practices under New York law, as well as cybersquatting under federal law.[8]

### D.  Qrypt is Entitled to a Presumption of Irreparable Harm in the Absence of an Injunction.

Qrypt is entitled to a rebuttable presumption of irreparable harm, as it has shown that it is likely to succeed on the merits of its claims under 15 U.S.C. § 1114 (infringement of a federally registered trademark). On December 27, 2020, the Trademark Modernization Act of 2020 (codified as part of the Consolidated Appropriations Act, 2021, Pub. L. 116-260) was signed into law. The Act, *inter alia*, amended the text of 15 U.S.C. § 1116(a) and codified a rebuttable presumption of irreparable harm which, as amended, now reads in relevant part:

> *A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm* upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or *upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order.*

*See City of N.Y. v. Lopez, No. 21 CV 7862 (JPO)*, 2021 U.S. Dist. LEXIS 243449 (S.D.N.Y. Dec. 21, 2021) (emphasis added); *Vans, Inc., et al. v. Walmart, Inc., et al.*, 21-cv-01876 (KES) Dkt. 65, *23 (C.D. Cal. Mar. 31, 2022). Accordingly, because Qrypt has established that it is likely to succeed on the merits of its claims under 15 U.S.C. §§ 1114, Qrypt is entitled to a presumption of irreparable harm under 15 U.S.C. § 1116(a).

---

[8] As stated above, because the scope of the proposed temporary restraining order and preliminary injunction wholly encompasses activity that presents immediate and irreparable harm to Qrypt's rights under the Lanham Act, full analysis of the other claims is not germane to the Motion. However, the facts and arguments raised in this Memorandum are equally applicable to the related claims, and Qrypt has met the standard for injunctive relief for each. Qrypt will provide supplemental briefing or attend a hearing on any issue upon the Court's request.

### E.  The Balance of Hardships Favors Plaintiff.

The balance of hardships overwhelmingly favors Qrypt. Qrypt has suffered, and will continue to suffer, irreparable harm to its business, the value and goodwill built up in and associated with the QRYPT Mark, and to its reputation because of Qryptonic's willful and knowing advertising and alleged sales of competing products and services. Any harm to Qryptonic would only be the loss of its ability to continue to offer and provide their substandard goods and services under a confusingly similar mark, *i.e.*, the loss of the benefit of being allowed to continue to unfairly profit from their use of the Infringing Mark.

### F.  An Order Enjoining Defendant's Activities Will Serve the Public Interest.

The public interest will be served by the issuance of a temporary restraining order and preliminary injunction, as "the public has an interest in not being deceived—in being assured that the mark it associates with a [service] is not attached to [services] of unknown origin and quality." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) (citations omitted). Here, the public has an interest in being able to rely on the high quality of the Qrypt products and services. Chalker Decl. ¶ 13. The nature of the goods and services at issue is extremely sensitive: Qrypt helps its consumers ensure that some of their most valuable assets remain secure against invasions by those who would seek to misappropriate or mutilate the information using advanced quantum computing methods. Companies that have the misfortune of experiencing a data breach must wade through weeks, if not months or years, of fallout, incurring significant financial and reputational damage from which many can never fully recover. Ensuring that those who implement the necessary protocols to defend against such an event know what they are doing serves multiple levels of the public, from the parties with whom

Qrypt contracts, down to the end consumer served by the parties in question. Just ask Equifax and the individuals whose confidential information was hacked in 2017.

Because Qryptonic has willfully and knowingly promoted substandard, and perhaps even dangerous, goods and services in the marketplace, the public would benefit from a temporary restraining order and preliminary injunction halting any further promotion and provision of such goods and services under the Infringing Mark.

### G. Plaintiff's Request for the Security Bond Requirement to be Waived is Appropriate, and Its Alternative Request to Set a Bond in the Amount of $2500 is Adequate.

In determining the amount of the bond that a moving party must post, this Court is "vested with wide discretion." *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).[9] With the foregoing in mind, Qrypt respectfully requests that the security bond requirement articulated in Fed. R. Civ. P. 65(c) be waived, as the only damages Qryptonic could plausibly suffer would emanate from its use of the Infringing Mark in violation of Qrypt's rights. In the alternative, Qrypt submits that the provision of security in the amount of $2,500 is sufficient.

### IV.    CONCLUSION

Qrypt has demonstrated that it owns valid, protectable rights in the QRYPT Mark, and shown a likelihood of success and raised both serious questions on the merits and a balance of hardships decidedly in its favor with respect to its Lanham Act claims and the related claims based on state and common law. Qrypt is entitled to a rebuttable presumption of irreparable harm under the Lanham Act, and an injunction would serve the public interests at large. Therefore,

---

[9] This Court has gone as far as to hold that no security bond is necessary in similar circumstances. *See Mattel, Inc. v. 86755, et al.*, No. 18-cv-8825-RJS-JSR (S.D.N.Y. Oct. 4, 2018) (The Hon. Richard J. Sullivan held that no security bond was necessary because "it strikes me almost as fairly arbitrary.")

Qrypt respectfully requests that this Court enjoin Qryptonic from the activities described in the Proposed Order submitted herewith.

Dated: January 22, 2026

Respectfully submitted,

**TRUST TREE LEGAL, P.C.**

Derrick M. Davis (BPR No. 037122)
Kevin P. Hartley (BPR No. 029199)
TRUST TREE LEGAL, P.C.
798 Berry Road #41400
Nashville, Tennessee 37204
Telephone: 865-867-7500
Email: derrick@trusttree.com
Email: kevin@trusttree.com

Attorneys for Plaintiff Qrypt Inc.

## **WORD COUNT CERTIFICATION**

Pursuant to Local Civil Rule 7.1(c), I hereby certify that Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction with Temporary Restraining Order complies with the pertinent word count limitations, as it contains 8514 words, excluding the caption, table of contents, table of authorities, signature block, and required certificates.

Dated: January 22, 2026

_____
Derrick M. Davis

### CERTIFICATE OF SERVICE

On January 22, 2026, I served a copy of the foregoing Memorandum in Support of Motion for Preliminary Injunction with Temporary Restraining Order on the Docket through the CM/ECF system, which will send a copy to all Counsel of Record who have appeared. I have also emailed a copy of the requisite documents to Defendant's counsel of record, Brian Gottesman at baruchgottesman@gmail.com.

Dated: January 22, 2026

By: _____

Derrick M. Davis

29