IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QRYPT INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>QRYPTONIC LLC,<br><br>　　　　Defendant. | Case No.: 1:25-cv-5275-AKH |

**DECLARATION OF KEVIN CHALKER**

I, Kevin Chalker, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based upon my personal knowledge of the facts stated herein or on the business records that were made at the time or in the regular course of business. If called as a witness, I could and would testify to the statements made herein.

2. I am the CEO of Qrypt, Inc. ("Qrypt"), the plaintiff in the lawsuit captioned above. I am knowledgeable of or have access to business records concerning all information referenced herein, including, but not limited to, Qrypt's business operations, trademarks and other intellectual property, sales, advertising, marketing, and media coverage. I am knowledgeable with respect to with Qrypt's products and services. I make this declaration from matters within my own knowledge except where otherwise stated.

3. Established in 2017, Qrypt was created to ensure lasting data security and privacy for individuals and organizations as quantum computing evolves.

4. Qrypt develops and markets various tools and services (the "Qrypt Goods and Services") to consumers and organizations who seek to protect the integrity and security of their

digital data from risks of breach, particularly including breaches using methods and software based on quantum encryption.

5. Qrypt is comprised of a team of individuals with vast expertise in the data security sector, and particularly, individuals with extensive knowledge of and experience in the realm of quantum computing, cyberinfrastructure, national security, international public policy, physics, and computer science.

6. Attached hereto as **Exhibit 1** is a true and correct copy of select bios from the Qrypt website (qrypt.com), along with screenshots of the Qrypt "about" page, which displays members of Qrypt's Board of Advisors.

7. Qrypt has longstanding partnerships with prominent figures in the quantum encryption and cybersecurity sectors, including credible research institutions such as Oak Ridge National Laboratory and Los Alamos National Laboratory, industry-leading private technology companies such as Nvidia, and educational institutions such as EPFL, a Swiss-based institute of technology.

8. Attached hereto as **Exhibit 2** is a true and correct copy of Qrypt's "partners" page of its website.

9. From the outset, Qrypt has promoted, sold, and rendered the Qrypt Goods and Services using the trademark QRYPT (the "QRYPT Mark").

10. The QRYPT Mark was derived from the term "quantum encryption," specifically by combining the "q" in "quantum" with the letters "rypt" from "encryption." This unique term has no defined meaning, nor do Qrypt's Goods and Services bear any relation to any defined meanings of the phonetically similar word "crypt." Attached hereto as **Exhibit 3** is a true and correct pdf screenshot of the Marriam-Webster definition of the word "crypt."

11. Both directly and through its officers, Qrypt has expended substantial time, effort, and financial resources on building a globally respected brand. Specifically, in addition to Qrypt's active promotion of its Goods and Services under the QRYPT Mark, Qrypt's officers routinely participate in leadership roles for prominent professional groups and events, such as the Forbes Technology Council, Nvidia's GPU Technology Conference, and the Department of Defense Cybersecurity Summit.

12. Qrypt is also the subject of prominent press releases concerning its innovations in the industry. For example, attached hereto as **Exhibit 4** is a true and correct pdf screenshot of a press release by the Department of Energy, which details Qrypt's involvement in the Quantum in Space Collaboration.

13. Through these individual and team commitments, which span nearly a decade, the QRYPT Mark has become indelibly linked with the high-quality, and properly certified, offerings promoted, sold, and rendered by Qrypt under the QRYPT Mark, particularly within the United States.

14. Qrypt has taken the appropriate measures to secure rights in the QRYPT Mark on a federal level, and owns U.S. Trademark Reg. No. 6,901,358 for the QRYPT Mark. *See* DE # 5-2.

15. To preserve its rights in the QRYPT Mark, Qrypt monitors for and seeks to prevent or stop unauthorized use by third parties of confusingly similar trademarks for related goods and services.

16. Shortly after becoming aware that the defendant in this lawsuit, Qryptonic LLC ("Qryptonic"), its founding member, Jason Ader ("Mr. Ader"), or one of the other entities

frequently associated with defendant[1] began using the confusingly similar mark QRYPTONIC (the "Infringing Mark") to promote highly related goods and services in violation of Qrypt's longstanding and prior rights in the QRYPT Mark, Qrypt instructed counsel to send Qryptonic a cease-and-desist letter to request that Qryptonic immediately discontinue all promotion and/or use of the Infringing Mark.

17. Attached hereto as **Exhibit 5** is a true and correct pdf printout of the February 18, 2025 cease-and-desist letter sent to Qryptonic on Qrypt's behalf.

18. On or about February 25, 2025, Qrypt received an email (delivered to counsel for Qrypt) from an account purportedly belonging to one "Jessica Gold," who claimed to be a "Partner at Qryptonic, LLC" (Jessica Gold). The February 25, 2025 response attempted to articulate several arguments, justifications, and *ad hominem* attacks as reasons why Qryptonic would not comply with any demands from the February 18, 2025 letter.

19. Attached hereto as **Exhibit 6** is a true and correct pdf copy of the February 25, 2025 email correspondence received in response to the February 18, 2025 letter.

20. Understanding that enforcement of its rights in the QRYPT Mark was a necessary means of preventing erosion thereof, Qrypt instructed counsel to proceed with the filing of a lawsuit to address the irreparable harm that Qryptonic's use of the Infringing Mark could cause to the goodwill in the QRYPT Mark. However, Qrypt did not believe at that time that Qryptonic posed a threat of immediate harm, as it did not believe the representations

---

[1] As alleged in the Complaint and discussed in detail in the Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction with Temporary Restraining Order, Qryptonic has interchangeably used designations other than Qryptonic, LLC (such as Qryptonic Inc.). At the time when the cease-and-desist letter was delivered, Qrypt was unclear as to why the various designations were used, and therefore addressed the letter to the general contact email shown in Exhibit 5.

as to the goods and services advertised under the Infringing Mark on the Qryptonic website to be truthful.

21. In December of 2025, following the Court's ruling on Qryptonic's Motion to Dismiss the lawsuit and while discussing the next phase of litigation with its counsel, Qrypt discovered that Qryptonic had updated its website to present a much more facially credible operation and increased its marketing activities to more actively promote the goods and services offered under the Infringing Mark, despite the fact that securing the credentials listed on the Qryptonic website in the amount of time in which the company has been operational seems improbable.

22. Attached hereto as **Exhibit 7** is a true and correct pdf screenshot of Qryptonic's updated landing page for its website, qryptonic.com (the "Qryptonic Website").

23. Several times each minute, a pop-up notification appears on the Qryptonic Website stating that a company of a specified background has interacted with Qryptonic to inquire about or procure the goods and services Qryptonic promotes under the Infringing Mark.

24. Attached hereto as **Exhibit 8** are true and correct pdf screenshots of three such examples, which purport to show "live activity from verified enterprise visitors."

25. Attached hereto as **Exhibit 9** is a true and correct pdf screenshot of the "case study" page of the Qryptonic Website.

26. Attached hereto as **Exhibit 10** is a true and correct pdf screenshot of the "services" page of the Qryptonic Website.

27. Attached hereto as **Exhibit 11** is a true and correct pdf screenshot of the "about" page of the Qryptonic Website.

28. Attached hereto as **Exhibit 12** is a true and correct pdf screenshot of the "leadership" page of the Qryptonic Website.

29. Also while preparing for the Case Management Conference, Qrypt learned that Mr. Ader had filed a trademark application claiming rights in a logo which prominently features the Infringing Mark and which claims rights in International Class 009 software goods and related International Class 042 services.

30. Attached hereto as **Exhibit 13** is a true and correct printout of the information available through the United States Patent and Trademark Office's Trademark Status & Document Retrieval system for U.S. Trademark App. Ser. No. 99/488,074.

31. Qryptonic has also become more active with its PR campaigns and press releases. Attached hereto as **Exhibits 14, 15, and 16** are a true and correct pdf screenshots of such articles and press authored by Mr. Ader and/or promoting Qryptonic, each of which was published within weeks after this Court's ruling on the Motion to Dismiss.

32. Attached hereto as **Exhibit 17** is a true and correct pdf screenshot of page 3 of the prospectus for 26 Capital Acquisition Corp., which describes Mr. Ader as the CEO of an "asset management firm and independent sponsor leading corporate turnarounds, with a particular focus on the real estate, gaming and lodging sectors."

33. Qryptonic's use of the Infringing Mark presents a significant risk of causing immediate and irreparable harm to Qrypt's rights in the QRYPT Mark.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 20, 2026

KEVIN CHALKER

6